## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KEITH JACKSON, SR., et al. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| ART OF LIFE, INC., et al. | : | NO. 10-3𝕏4 3043 |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACOB P. HART                                                          DATE: *12/12/11*
UNITED STATES MAGISTRATE JUDGE

In this action, plaintiffs Keith Jackson, Sr., Kevin Joe, David Whaley, Gregory Reaves,

Jr., and Aja Garlick (now Mrs. Reaves) allege overtime violations under the Fair Labor Standards

Act ("FLSA") (29 U.S.C. § 201, *et seq.*) against defendants Art of Life, Inc., Advanced Life

Support Ambulance, Inc., and Nick Broytman. A bench trial was held before the undersigned on

November 1, 2011.

As explained in the forthcoming findings of fact and conclusions of law, which are set out

in a narrative form, I find in favor of plaintiffs and against all defendants in the total amount of

$105,078.62.

I.     The Trial Evidence

A.     Plaintiffs' Testimony

Art of Life, Inc. ("Art of Life") is a Pennsylvania corporation engaged in the business of

medical transportation, including both para-transit in vans, and emergency transportation in

ambulances. Trial Transcript ("Transcript") at 151-152. Defendant Nick Broytman owns 50%

of the stock of Art of Life, and his father owns the other 50%. Id. at 151. His father, however,

does not manage the company. Id. at 157. Daily business operations are conducted by Nick

Broytman, and, secondarily, by his general manager, Igor Makhnovetskiy. Id. at 157-158.

All five plaintiffs were para-transit van drivers for Art of Life. (Garlick remains employed by Art of Life, but is on disability; the other plaintiffs are no longer employed by Art of Life). Pretrial Stipulation at ¶ ¶ 1-2. Their duties were to transport elderly or infirm individuals in the Philadelphia area to medical appointments, day programs, or other destinations, and then to pick the individuals up and return them to their residences. Id. at ¶ 3; Transcript at 9 (Jackson's testimony); 64 (Whaley's testimony); 124 (Garlick's testimony).

The plaintiffs typically worked over 40 hours per week. Each plaintiff usually had a first pickup around 5 or 6 a.m., and a last pickup around 3 p.m. Transcript at 13-15 (Jackson); 64-68 (Whaley); 102-104 (Joe) and 125-126 (Garlick).[1] However, they had to arrive at the Art of Life workplace well in advance of the first pickup, in order to obtain the van and drive to the first pickup site. Id. at 148-9 (Testimony of Igor Makhnovetskiy).

Further, the plaintiffs did not clock out at Art of Life until several hours after their last pickup, since they had to return the passengers to their residences, which could be far apart. Id. at 150 (Makhnovetskiy's testimony). For example, Jackson testified that he was assigned to pick up between ten and twelve individuals from a mental health program at 3:00 p.m., and take each one home "to various locations around the city, West Philly, South Philly, North Philly, Kensington, Northeast." Transcript at 9-10. After this, a plaintiff would drive back to Art of Life, and clean the inside and outside of the van before leaving for the day. Id.

---

[1]Gregory Reaves had a throat illness on the day of trial, and did not testify. However, the parties stipulated that, had he testified, his testimony would have been substantially identical to that of the other plaintiffs in the significant details. Transcript at 138-139.

2

Plaintiffs testified that they were unable to take breaks during the day because they were continuously picking up and dropping off clients at various locations in the area. Transcript at 10 (Jackson's testimony). Thus, plaintiffs generally worked 12-14 hours per day, for a five or six-day week, which added up to 60 or 70 hours per week. Transcript at 15 (Jackson); 68-69 (Whaley); and 104-107 (Joe).

Each plaintiff testified at trial that he or she was paid hourly, at a rate between $10 and $11.50. Transcript at 16-18 (Jackson); 71, 90 (Whaley); 108 (Joe); 129-130 (Garlick). Jackson, Whaley and Joe all testified that Makhnovetskiy told them upon hiring that they would be paid hourly, and what their hourly rate would be. Transcript at 16 (Jackson); 71 (Whaley); 108 (Joe). Garlick testified that she was told her hourly wage by a scheduler/dispatcher named Ala. Transcript at 129. Jackson testified that he was told by Makhnovetskiy that he could work all the hours he liked, but that the company did not pay overtime. Transcript at 44. Garlick and Joe also denied that they were paid overtime. Transcript at 109 (Joe); 130 (Garlick). Whaley did not testify to this directly, but affirmed that he was claiming entitlement to unpaid overtime. Transcript at 75.

Each plaintiff specifically denied that he or she was ever paid a salary or given the option of receiving a salary. Transcript at 16 (Jackson); 72 (Whaley); 109-110 (Joe); 130 (Garlick). Jackson, Whaley and Joe, however, testified that in February 2010 they were told they could either switch to a flat weekly rate or have their hours cut to 30 or fewer per week. Transcript at 18 (Jackson); 71-72 (Whaley); 108-109 (Joe). Garlick had ceased working in January, 2008. Transcript at 124.

3

B.    Plaintiffs' Exhibits

Plaintiffs have provided as trial exhibits spreadsheets for each plaintiff, setting forth six

categories of information: the number of hours worked in each two-week pay period; the amount

of money paid for this period; the hourly rate during that pay period; the overtime rate for the

period; the number of hours over 40 worked during the period, representing overtime; and,

finally, the amount of unpaid overtime wages for that period. Plaintiffs' Exhibits 34-38. The

exhibits show that Keith Jackson is owed $8,188.89; Kevin Joe is owed $20,631.34; David

Whaley is owed $19,114.21; Gregory Reaves is owed $3,137.98; and Aja Garlick is owed

$1,466.89. Plaintiffs' Exhibits 34-38, respectively.

As discussed below, Defendants deny that Plaintiffs were paid hourly. However,

Defendants have not criticized the methodology employed in the creation of the spreadsheets.

For that reason, it is sufficient to explain briefly that Plaintiffs' Exhibits 34-38 are compilations

of information drawn from Plaintiffs' earnings statements, and from the time cards provided by

Art of Life, when possible. Transcript at 19; Joint Exhibits 3-12.

In many instances, no time card was provided. When this was the case, Plaintiffs

estimated the hours worked by using records from LogistiCare.[2]   Transcript at 20-21; Joint

Exhibit 16. LogistiCare records do not show the time expended before the first pickup, or after

the last pickup. For that reason, Plaintiffs added three hours to those shown by LogistiCare for a

particular day: one hour to account for time spent in the morning, picking up the van and driving

---

[2]LogistiCare is a company that arranges with nursing care facilities to provide transportation services.
Transcript at 20-21, statement by Plaintiff's attorney Adam Lease. It contracted with Art of Life, among other
companies, to actually provide the transportation. Id. LogistiCare was the predominant source of work for Art of
Life. Id. Art of Life was required to provide LogistiCare with daily driving schedules which permitted LogistiCare
to keep records showing, for a given day, each driver's first pickup time and last pickup time. Id.

4

to the first pickup location, and two hours after the last pickup, to account for time spent returning passengers to their homes, and returning and cleaning the van at the end of the day. Transcript at 23, 26.

Plaintiffs also focused at trial on examples pulled from their time cards, showing that each plaintiff's pay, when divided by the number of hours worked, actually equaled the hourly rate of pay to which the plaintiff had testified. Transcript at 49-59 (Jackson); 92-97 (Whaley), Exhibits 3-7. For instance, Whaley was paid $1,240 for the period of August 26 to September 2, 2007. Id. at 93. He worked 124 hours in that time period. Id. at 92. Thus, he was paid $10 per hour, as he had testified. For the period of October 21-28, 2007, he worked 125 hours. Id. at 95. He was paid $1,250. Id. at 96. Whaley testified that he was at some point given a pay raise to $11 per hour. Id. at 71, 96. For the pay period between January 27 and February 3, 2008, he was paid $1,386 for a 126-hour week, at a rate of $11 per hour Id. and 96. Similarly, for the period of February 10-17, 2008, Whaley was paid $1,391.50 for a 126.35-hour week, also at a rate of $11 per hour. 96-97.

When counsel examined Joe on redirect, he began to show similar examples. However, the Court stopped him: "I know what you're going to do because you've done it with the last two witnesses ... Once you've done it once, I understand it." Transcript at 122. Nevertheless, the Plaintiffs have attached as Exhibit A to their Proposed Findings of Fact and Conclusions of Law similar examples for Joe, Garlick and Reaves. This information may be considered by the Court because it is not new evidence. Rather, it is a series of calculations drawn from admitted exhibits, i.e., the time cards and earning statements.

Also admitted into evidence was a letter from Art of Life written to Garlick during her disability, inviting her to resume her employment "without loss of wages ($11.00/hour working a 36 hour minimum week per our records)." Plaintiffs' Exhibit 41.

C.      The Defense

1.      Broytman's Testimony

Nick Broytman was the sole witness for the defense. He agreed at trial that he is personally responsible for administering the payroll at Art of Life. Transcript at 194. In other litigation, Broytman has testified as the corporate designee having the most information about payroll practices at Art of Life. Id. at 195.

Broytman testified that no plaintiff was ever paid hourly except for Garlick, who opted after a few pay periods to convert to salary. Transcript at 175-176. Broytman stated that each plaintiff was told upon employment that he or she had the option of either working for an hourly wage or for salary. Id. at 186. However, in order to keep overtime hours down, hourly workers would ordinarily be limited to between 37 and 40 hours per week. Id. at 190.

Broytman testified that salaried workers also got overtime, calculated in a method prescribed by the United States Department of Labor, but that this resulted in a lower overtime rate than that which hourly employees would receive. Id. at 177. Therefore, the company saved money. Id.

As discussed more fully below, exhibits submitted by the Defendants showing their purported method of paying the plaintiffs salary plus overtime never corresponded to the gross amount of pay the plaintiff actually received. Defendants' Exhibits 9-13. When asked to explain this, Broytman stated:

6

We – at the time of our discussion about the salary, so we were asking them, what's your desired or goal rate? And they would say, okay, my desired rate is 10 or 11 or whatever. So we would be generous enough to – we would tell them that we will try to bring the amount to the desired rate.

Transcript at 203. In response to additional questioning from the Court, Broytman repeated this assertion.[3] Id. at 205.

In response to questioning from the Plaintiff's attorney, who called him as on cross, Broytman also testified about Art of Life's contacts with the Department of Labor. Art of Life was the subject of three Department of Labor investigations between 2004 and 2008. Transcript at 168-171. The first investigation concerned a failure to pay overtime. Id. at 168. The second investigation concerned, among other issues, "paying overtime under the guise of a fixed salary for fluctuating hours." Id. at 170, Plaintiffs' Exhibit 43.

2.    Defendants' Exhibits

Like Plaintiffs, Defendants submitted into evidence spreadsheets for each plaintiff, purporting to show how Plaintiffs were actually paid. Defendants' Exhibits 9-13. These exhibits were e-mailed to the plaintiffs' attorney the evening before trial. Transcript at 196. Some of the data, such as the time estimates where a timecard was missing, was taken from Plaintiffs' spreadsheets. Id. at 248. The spreadsheets presented a theory of compensation that was never before asserted in the litigation. Id. at 255.

Defendants' spreadsheets showed the hours worked during a specific pay period. Id. The next column set forth a salary, which tended to be about $1,000 per week. Id. Then, the

_____

[3]"Again, because at the time of our discussions with the salary, so we asked them about the desired rate. And they would say that, for example, I want to have $10. And then we would say, okay, we will try to bring that amount to the desired rate. So – and we were generous enough to do that so we paid them actually more than they were entitled." Transcript at 205.

7

spreadsheet showed some categories of information which were used to calculate overtime for a salaried individual. These were "actual rate" (i.e., hours worked divided into the salary), half-rate, overtime hours, and "overtime", i.e., overtime hours multiplied by the half-rate to obtain a monetary figure. Id. Then the chart showed "calculated compensation", which was simply the salary plus the figure in the "overtime" column. The next column was labeled "gross compensation" and the last column was labeled "difference." Id.

In every pay period for every plaintiff (except for two of Garlick's) there was a significant difference between the amount actually paid and the salary-plus-overtime calculation. Id. Rarely, there was a small negative difference. Id. Almost always, there was extra money paid, sometimes as little as $18, but usually between one and three hundred dollars. Id. As described above, Broytman explained this constant discrepancy by stating that he asked each plaintiff for his or her desired hourly rate, and then, out of "generosity", added extra money to that plaintiff's check, in order to reach that rate. Transcript at 203 and 205.

The salary for some plaintiffs also changed for no explained reason in isolated pay periods. Kevin Joe, for example, has salary listed as $910.00 for 31 straight pay periods. Defendants' Exhibit 10. Then, his salary moves to $1,000 per week for six pay periods. Id. For the period ending September 14, 2008, however, his salary was only $640. Not the amount of his paycheck: the amount in the column labeled "salary." Id. After this pay period, Joe's salary remained at $1,000 per week for the rest of his employment with Art of Life – except for the pay period ending February 14, 2010, where it was again $644, for one pay period only. Id.

8

The figures in Garlick's "salary" column also changed markedly between pay periods. Exhibit D-13. Broytman said: "It is normal to fluctuate the salary. It depends on the amount of hours." Transcript at 211.

Defendants are aware that their spread sheets do not demonstrate that the Plaintiffs' pay equaled a salary plus overtime. Their explanation is that, as a result of Art of Life's "agreement to provide additional discretionary sums each pay period", for the "vast majority" of the Plaintiffs' employment, they were paid "in an amount substantially in excess of the amount ... owed." Defendants' Proposed Findings of Fact and Conclusions of Law at ¶ 54, 71, 80, 88, 96.

Defendants also relied upon the Plaintiffs' earnings statements, copies of which had been given to Plaintiffs as pay stubs. Joint Exhibits 8-12. Upon cross-examination, each plaintiff admitted that the pay stubs did not appear to represent payment by the hour. Transcript at 42-43 (Jackson); 84 (Whaley); 120-121 (Joe); 135-136 (Garlick). Plaintiffs also conceded that they did not understand their pay stubs. Transcript at 42 (Jackson); 81, 87 (Whaley); 120-121 (Joe); 136 (Garlick). Jackson, Whaley and Joe testified that they never questioned their employer about the confusing pay stubs. Id. at 47-48 (Jackson); 84 (Whaley); 121 (Joe). Garlick testified that she asked Makhnovetskiy and Broytman to explain why it did not appear in her pay stub that she was paid hourly. Id. at 136. However, even after the explanation, she did not understand her pay stub. Id.

Defendants argue that the Plaintiffs' case is undermined by the admitted truth "that they received information about the basis for calculating their employment with every paycheck, that the information is inconsistent with their claim that they were paid hourly, that they could not comprehend or explain the entries on their pay stubs, that they did not seek explanations of those

9

entries and that they made no objection to their compensation during the entire course of their employment." Defendants' Proposed Findings of Fact and Conclusions of Law at 14. It is argued that "no employee, let alone a group of employees, would remain employed without having any understanding of the basis on which they were being compensated in a manner reflected by the testimony of the Plaintiffs." Id. at 15.

However, Broytman was also unable to answer every question about the pay stubs. Most of them contained amounts of money, sometimes $500 or more, in a category titled "Other." Joint Exhibits 9-12. At times, the amount in the "Other" column was several thousand dollars. Exhibit 9 at Bates Stamp D-0380 ($8,613 for Joe); Exhibit 11 at Bates Stamp D-0375 ($4,320.50 for Reaves); Exhibit 12 ($2,503.75 for Garlick). Broytman was not able to offer an explanation as to the function of the "Other" classification. Transcript at 184-185.

D.    Advanced Life Support Ambulance, Inc.

Defendant Advanced Life Support Ambulance, Inc., ("Advanced") is a Pennsylvania corporation of which Nick Broytman is a 40% shareholder. Transcript at 1151, 155. Broytman's mother is a 60% shareholder of Advanced, and is the corporation's president. Id. at 151, 158. Broytman testified that Advanced was formed for the purpose of providing para-transit service, but not emergency services. Id. at 231.

In the deposition excerpts Plaintiffs read into evidence, Makhnovetskiy essentially testified that he was paid by both corporations for one and the same work. Transcript at 146. He said: "I got the same salary for two companies." Id. Makhnovetskiy was asked whether the four dispatchers worked for both companies, and he answered: "It depends. Sometimes yes, sometimes no." Id. However, all dispatchers worked out of the Art of Life location. Id. He was then asked: "Pretty much everyone works for Advanced Life? They do it for Art of Life?" Id.

10

He responded: "Yes." Id. Makhnovetskiy also testified that he did not know the company address for Advanced. Id. He agreed that employees of both companies punched in and out on the same time clock. Id. at 146-147.

In his testimony, Broytman denied much of this. Transcript at 153. He testified that it was not true that Makhnovetskiy was the employee of both companies. Id. He denied that Advanced employees punched in on the Art of Life time clock. Id. at 153-154. At his deposition, Broytman had testified that both corporations shared the same management hierarchy: Broytman was "at the top", Makhnovetskiy was the manager, and an individual named Anatoly was the scheduling coordinator. Id. at 158. At trial, however, Broytman testified that this was not true, and that he had been confused. Id. at 158-159. He similarly disavowed his deposition testimony that the two companies had shared employees. Id. at 160-162.

Broytman also testified that Advanced employees did work under Art of Life's contract with LogistiCare, pursuant to an agreement between the two related corporations. Transcript at 165. Advanced employees did not "have any of their own independent work." Id. Further, as of the date of Broytman's deposition, two years after Advanced was created, the corporation had no assets of its own. Id. at 166.

II. Findings of Fact

A. Plaintiffs Were Paid Hourly

I find as a matter of fact that Plaintiffs were paid hourly by Art of Life. Plaintiffs' testimony that they were each told that they would be paid hourly was consistent, simple, and plausible. Defendants' theory as to how Plaintiffs were paid has none of these advantages. It is inconsistent with pre-trial representations, complex, and so unusual as to be implausible.

11

Plaintiffs' position is also supported by external evidence, such as the October 8, 2009,

letter to Garlick from Art of Life, reflecting that she had been paid $11.00 per hour. It is also

supported by the demonstration that Plaintiffs' paychecks, divided by the number of hours

worked in the relevant pay period, generally came out to the even, hourly rates of $10.00 or

$11.00 per hour which they allege. See Exhibit A to Plaintiffs' Proposed Findings of Fact and

Conclusions of Law.

Defendants' allegations, on the other hand, are inconsistent with the evidence. Even

using their theory, as set forth in their Exhibits 9-13, their calculations are so inaccurate that, out

of hundreds of pay checks, only two came out to the right amount of salary plus overtime. Every

other check was in an amount inconsistent – often by hundreds of dollars – with Defendants'

own formula. I am also influenced by the fact that this supposed method of pay was only put

forward for the first time the evening before trial. Defendants would have had much to gain by

explaining it in pre-trial discovery as soon as possible, yet they did not. I find as a matter of fact

that the formula set forth in Exhibits 9-13 was never actually used in calculating Plaintiffs' pay.

Broytman's explanation that he asked Art of Life employees for their desired hourly rate,

and "generously" agreed to supplement their salaries to reach this rate, is utterly incredible. It is

impossible to imagine an employee being given the option of choosing his own hourly rate. If

Art of Life wished to pay an employee more, why would it not simply raise his or her salary?

Even if Broytman's story was true, it would arguably constitute an admission that the

employees were really paid an hourly rate, since their salaries were manipulated to reach this rate

by the use of "discretionary payments." However, I do not credit his story. It was clear at trial

that Plaintiffs were befuddled by their earnings statements, and did not know what they actually

showed, or why.

12

Because (a) Plaintiffs' pay generally equaled the hourly rates they have alleged; and (b) the earnings statements generated by Art of Life do not show this, but rather show a salary method of payment; and (c) neither Broytman, nor the defense exhibits could clearly explain the nature of this salary method, I conclude as a matter of fact that Plaintiffs' earnings statements were generated by Art of Life for the purpose of making it falsely appear that Plaintiffs received salary plus overtime, and concealing the fact that Plaintiffs were paid hourly.

B.    Art of Life Did Not Pay Plaintiffs Overtime

All of the plaintiffs testified that they were paid an hourly rate, but were never paid an overtime rate, despite routinely working more than 40 hours in a workweek. Jackson testified that Makhnovetskiy, Art of Life's general manager, told him directly that he could work all the hours he wanted, but would not be paid overtime. The evidence provided to Plaintiffs in discovery by Art of Life and LogistiCare, and summarized in Plaintiffs' Exhibits 34-38, supports Plaintiffs' allegations that this was Art of Life's policy: employees could work very long hours, but would not receive overtime.

As above, Defendants' contrary explanations are not credible. I therefore find as a matter of fact that Art of Life did not pay Plaintiffs overtime on hours worked in excess of a 40 hour workweek.

C.    The Plaintiffs' Calculations of Unpaid Overtime Are Reasonably Reliable

As discussed above, Plaintiffs have set forth their calculation of unpaid overtime in their Exhibits 34-38. As has also been mentioned, Defendants dispute the premise underlying these exhibits, i.e., that Plaintiffs were paid by the hour, but have not challenged the accuracy of the data or the validity of the methods used in creating these exhibits. Plaintiffs have conceded that the spreadsheets include a great deal of estimation, based on LogistiCare records and their own

13

testimony, where actual time cards were missing. The Defendants are so far from challenging these estimates as to have used them in preparing their own exhibits. Therefore, I have no reason to question the reliability of Plaintiffs' exhibits.

I have found as a matter of fact that Art of Life paid Plaintiffs by the hour, but did not pay overtime. Accordingly, I now find that Plaintiffs' estimates of unpaid overtime are sufficiently reliable as to be adopted in calculating damages. Keith Jackson is owed $8,188.89 in unpaid overtime; Kevin Joe is owed $20,631.34; David Whaley is owed $19,114.21; Gregory Reaves is owed $3,137.98; and Aja Garlick is owed $1,466.89. Plaintiffs' Exhibits 34-38, respectively.

D. The Relationship Between Art of Life and Advanced Life Support Ambulance, Inc.

Based on the evidence as set forth above, I find as a matter of fact that Advanced and Art of Life have strongly interrelated operations, since all of the work Advanced performs in pursuant to Art of Life's contract with LogistiCare, and since Advanced has no assets with which it could undertake independent work. Further, they share an identical management, in Broytman and Makhnovetskiy. They have a unified control of labor relations in the hands of Nick Broytman. They also have a strong element of common ownership or financial control, based on Nick Broytman's large interest in both corporations, and also on the fact that the only other owner of each corporation is one of Nick Broytman's parents.

III. Conclusions of Law

A. Art of Life Is Liable to Plaintiffs For Violation of the FLSA Overtime Law

FLSA generally requires an employee to pay time and a half overtime, with certain exceptions which have not been invoked here:

Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in

14

the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1).

Because Art of Life did not pay Plaintiffs overtime for hours over 40 in a workweek, it is in violation of FLSA.

B.    Nick Broytman Is Individually Liable for Violation of the FLSA Overtime Law

As noted, FLSA prohibits an "employer" from failing to pay overtime compensation. 29 U.S.C. § 207(a)(1). It defines an "employer" as including "any person acting directly in the interest of an employer in relation to an employee ...." 29 U.S.C. § 203(d).

Although there is no Third Circuit decision on the issue, FLSA has consistently been interpreted in the district courts of this circuit as providing that "a corporate officer with operational control is an 'employer', along with the corporation, jointly and severally liable under the Act for unpaid wages." Dole v. Haulaway, Inc., 723 F. Supp.274, 286-287 (D.N.J. 1989), aff'd 914 F.2d 243 (3d Cir. 1990), cert. den. 497 U.S. 1024 (1990); and see Dole v. Solid Waste Services, Inc., 733 F. Supp. 895, 922 (E.D. Pa. 1989), aff'd 897 F.2d 521 (3d Cir.), cert. den. 497 U.S. 1024 (1990), and Su v. Li, Civ. A. No. 10-5268(MLC), 2011 WL 3329882 at *4 (D.N.J. Aug. 1, 2011).

The evidence reviewed above clearly shows that Nick Broytman was a corporate officer with operational control with respect to Art of Life. Moreover, he was personally responsible for deciding how Plaintiffs would be paid. He is, therefore, jointly and severally liable with Art of Life for the violation of the FLSA overtime law.

15

C.     Advanced Life Support Ambulance, Inc., is Liable to Plaintiffs

In Pearson v. Component Technology Corp., 247 F.3d 471 (3d Cir. 2001) the Court of

Appeals for the Third Circuit discussed the theory whereby the veil between two corporations

may be pierced, and two corporations treated as a single employer, if they meet the factors for an

"integrated enterprise", which the Court described as "a sort of labor-specific veil-piercing test."

Id. at 485.

According to Pearson, the "integrated enterprise" test does not involve the traditional

veil-piercing inquiries regarding the observance of corporate formalities. Rather, it:

[L]ooks to four labor-related characteristics of affiliated corporations; interrelation
of operations; common management; centralized control of labor relations; and
common ownership or financial control.

Id. Based on the facts as I have found them in Section IID of this opinion, it is clear that

Advanced and Art of Life are integrated under this test.

Although the Pearson case set out the factors for the "integrated enterprise" test, it did not

actually apply the test. Moreover, the case did not concern the FLSA. Instead, Pearson was

decided under the WARN Act, 29 U.S.C. § 2101 *et seq.* The Court of Appeals decided that the

integrated enterprise factors were subsumed in the test prescribed by the Department of Labor

regarding whether a parent and a subsidiary are a single entity under WARN.

Therefore, there is no Third Circuit precedent which speaks to the issue of whether the

integrated enterprise test can be used in this circuit to impose direct liability in a FLSA overtime

case. Authority in this district appears to recognize the possibility, however. In Kamens v.

Summit Stainless, Inc., 586 F. Supp. 324 (E.D. Pa. 1984), the Honorable Judge Hutton refused to

dismiss such a claim in a FLSA overtime case. More recently, the theory was dismissed, but not

16

on its merits; rather, under the "rule of the case" theory, since the judge had made a contrary finding before the theory was raised. Bosley v. The Chubb Institute, 516 F. Supp.2d 479 (E.D. Pa. 2007).

Further, as noted in Pearson, the joint enterprise test has been used in FLSA overtime cases decided in other courts. Pearson, supra, at 486-486, citing Takacs v. Hahn Auto. Corp., Civ. A. No. C-3-95-404, 1999 WL 33117265 (S.D. Ohio Jan. 4, 1999); see also Reich v. Bay, Inc., 23 F.3d 110 (5th Cir. 1994) (liability imposed on sister corporation); Babych v. Psychiatric Solutions, Civ. A. No. 09 C 8000, 2011 WL 5507374 (N.D. Ill. Nov. 9, 2011) (dismissal of joint enterprise claim denied); Addison v. Reitman Blacktop, Inc., Civ. A. No. 10 CV 1435 (ADL)(ARL) – F.R.D. —, 2011 WL 4336693 (E.D.N.Y. Sep. 9, 2011) (dismissal of claim denied); Anderson v. Theriault Tree Harvesting, Inc., Civ. A No. 08-330-B-W, 2010 WL 323530 (D. Me. Jan. 20, 2010) (Magistrate Judge's Report and Recommendation) (dismissal of claim denied) (stipulated dismissal of case at 2010 WL 3180924 (D. Me. Apr. 12, 2010)).

Moreover, the integrated enterprise test is consistent with FLSA, which extends overtime protection to employees of any "enterprise" engaged in interstate commerce. 29 U.S.C. § 207. The FLSA regulations define an "enterprise" as "the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose." 29 U.S.C. § 203(r). "Related activities" are not defined in the FLSA regulations. However, activities are performed for a common business purpose if they are "directed toward the same business objective or to similar objectives in which the group has an interest." 29 C.F.R. § 779.213.

17

At trial, counsel for defense suggested that the single enterprise theory is only relevant in cases where an employee works up to 40 hours for one employer, but works additional hours for another, so that it is apparent that the two employers worked together to avoid paying overtime. Transcript at 217. His larger point may have been that the single enterprise theory is successfully invoked only where the relationship between the parties is factually relevant to the FLSA violation. Here, it is not. Plaintiffs hope to convince the court to hold Advanced jointly liable with Art of Life only so that, during collection, they will not have to chase assets that Art of Life may transfer to Advanced. Record at 220.

Thus, the question is whether the single enterprise theory can be used to prevent the hiding of corporate assets, or whether that requires resort to the traditional veil-piercing test, employed during the collection process.

The case law does not provide a clear answer. In Reich v. Bay, Inc., supra, one company reduced the rent it paid to an employee for the use of his equipment every time the other company raised his pay for overtime purposes, resulting in a wash for the employee. Clearly, the integrated nature of the enterprise was factually related to the FLSA violation. But in Takacs v. Hahn Auto. Corp., supra, where a single enterprise was found, the question was simply which entities could be held liable. In the cases where courts declined to dismiss single enterprise claims, moreover, they never discussed whether there was a factual link between the alleged FLSA violation and the relationship of the named defendants. See Kamens, supra; Addison, supra; Anderson v. Theriault, supra.

18

I conclude that the use of the joint enterprise/single employer theory which the Plaintiffs recommend is permissible. The thread uniting the cases which employ this theory is that they all seek to determine whether the proposed "joint" company is actually identical to a plaintiff's technical employer. As explained in Pearson, the corporate formalities which are central to the traditional veil-piercing inquiry are simply not as important under FLSA as whether the two companies acted jointly with respect to labor issues. The theory is also consistent with FLSA regulations defining "employer. Finally, although the case law may offer little guidance on this issue, I am not aware of any authority in any form which would preclude the use of this theory on facts such as those presented in this case, or which even discusses the issue decided here.

At least at all times relevant to this case, Advanced clearly had very little existence independent of Art of Life. Advanced had no work other than that provided by Art of Life, and could not have acted independently, since it had no assets. The two companies were controlled by one and the same person: Nick Broytman. I have no hesitation in concluding that they acted jointly. I conclude as a matter of law, therefore, that Advanced Life Support Ambulance, Inc., is liable to Plaintiffs.

D.    Defendants' FLSA Violations Were Wilful

A finding of wilfulness in a FLSA action has a double importance. First, it extends the applicable statute of limitations from two years to three years. 29 U.S.C. § 255a). Second, it permits the imposition of liquidated damages in an amount equal to the amount of the Plaintiff's unpaid overtime compensation; hence, double damages. 29 U.S.C. § § 216(b), 260.

19

The determination of whether a FLSA violation was willful is a question of law on which the plaintiff bears the burden of proof. Wolfslayer v. Ikon Office Solutions, Inc., Civ. A. No. 03-6709 (E.D. Pa. 2004), citing Adams v. United States, 305 F.3d 1216, 1229 (Fed. Cir. 2003) (plaintiff bears burden) and Martin v. Selker Bros., Inc., 949 F.2d 1286, 1292 (3d Cir. 1991) (wilfulness is a question of law). To show wilfulness, Plaintiffs must show that Defendants either knew that their conduct was prohibited by FLSA, or have acted in reckless disregard of whether or not is was prohibited. McLaughlin v. Richland Shoe Company, 486 U.S. 128 (1988). It is not enough that FLSA have been "in the picture." Id.

The evidence in this case supports a finding of wilfulness. By the time the facts of this case arose, Nick Broytman and Art of Life had been investigated several times by the DOL with respect to alleged overtime violations. Broytman's testimony at trial suggested that he only learned one nugget of information about overtime in each investigation. Transcript at 168 (learned in 2004-2005 proceeding that overtime had to be paid after 40 hours, not after 80); 169 (learned that when paying overtime for a fixed salary, emergency rate had to be calculated in for emergency medical technicians). Nevertheless, after all of this exposure, it cannot be credited that Broytman did not know the basic rule that an employee must be paid time and a half overtime after 40 hours per week.

Moreover, the settlement with respect to the 2008 DOL investigation involved an agreement on Art of Life's part to keep separate track of payroll entries, overtime, and hours worked. Transcript at 172. This is additional evidence that Art of Life, and specifically Broytman, was aware of the very basic overtime law involved in this case.

20

Further, I have found as a matter of fact that the earnings statements which where generated by Art of Life purposely concealed the fact that Plaintiffs were paid straight hourly wages with no overtime. As discussed above, Broytman was not able to offer a clear or credible explanation of how the earnings statement reflected a salary method of payment. His explanation relied on his implausible statement that he actually overpaid all of the Plaintiffs out of "generosity" so that their salary would *resemble* hourly pay. This purposefully deceptive action regarding the earnings statements clearly demonstrates wilfulness.

I conclude, therefore, as a matter of law, that Plaintiffs have demonstrated wilful failure to comply with FLSA on the part of the Defendants. For this reason, a three-year statute of limitations applied in this case. Further, each Plaintiff is entitled to liquidated damages equal to the amount of unpaid overtime, in addition to actual damages in the amount of unpaid overtime. Therefore:

1) Plaintiff Keith Jackson is entitled to recover $16,377.78;

    2) Plaintiff Kevin Joe is entitled to recover $41,262.68;

    3) Plaintiff David Whaley is entitled to recover $38,228.42;

    4) Plaintiff Gregory Reaves is entitled to recover $6,275.96; and

    5) Plaintiff Aja Garlick (Reaves) is entitled to recover $2,933.78.

IV.    Conclusion

Based upon the findings of fact and conclusions of law set forth above, I conclude that

Defendants Art of Life, Inc., Nick Broytman, and Advanced Life Support Ambulance, Inc., are

jointly and severally liable to Plaintiffs in this case in a total amount of $ 105,078.62, plus costs

and a reasonable attorney's fee as provided by 29 U.S.C. § 216(b).

BY THE COURT:

JACOB R. HART
UNITED STATES MAGISTRATE JUDGE

22